one, it is not important to determine. But it is clear that he had no right to consider the paper that he received from Baker as binding upon the plaintiff, or as being any part of the contract he had made with it; and, in my opinion, as matter of law, he cannot be allowed to plead that paper as a defense to the contract which he in fact did make. He was not deceived by the agent. There is no proof that any representation whatever was made to him, and, indeed, in the face of the writing he signed, no representation whatever could have deceived him. The paper which he did sign was not accompanied by any such modifying agreement, and by it the plaintiff evidently was the party deceived. The defendant does not even claim that he supposed the modifying contract was indorsed on the one he signed. He seems to have made a clear contract with the plaintiff to purchase the goods in question at the prices and upon the terms therein stated; and the collateral agreement made with Baker, but not with the plaintiff, is insufficient to change it. The plaintiff should have recovered upon that contract, and therefore the judgment for the defendant should be reversed.

Moreover, concede that the indorsement made by Baker was binding upon the plaintiff, on the defendant's own claim he was liable to the plaintiff for the sum of $1.49, being the value of such of the goods received as he had sold within the four months. That amount, under the terms of the contract, as he claims it to have been, was due and owing to plaintiff. This judgment is a bar to its ever recovering that amount. Evidently it is erroneous in that respect, and for that further reason it must be reversed. It is said that defendant has always been ready to pay that amount. If so, he should have offered upon the trial that judgment go against him for that amount. We cannot sustain a judgment against plaintiff that clearly should have been in its favor.

The judgment of the justice and of the county court must be reversed, with costs in both courts and of this appeal.

All concur.

---

GERSTNER v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. March 10, 1903.)

1. SERVANT—INJURY—ASSUMPTION OF RISK.
　　Plaintiff was a yard brakeman, and part of his duty was to board defective cars as they were sent from the main track onto the repair track, and bring them to a stop. These defective cars were taken out of the train by the inspectors, who examined the trains as they came into the yards, and marked the defective cars with signs to indicate the defect. In attempting to board one of these cars marked to have defective bumper bolts, plaintiff was injured by stepping on a defective brake beam. Held, that plaintiff had assumed the risk of injury from defects in the cars, and had no right to rely on the marking to indicate the nature of the defect.

2. SAME—INSPECTION—MASTER'S DUTY.
　　The master owed no duty to his servants as to the manner in which this inspection should be made.

---

¶ 2. See Master and Servant, vol. 34, Cent. Dig. § 238.

Appeal from Trial Term, Niagara County. ·

Action by Frank X. Gerstner against the New York Central & Hudson River Railroad Company. Judgment for plaintiff, and defendant appeals. Reversed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and NASH, JJ.

Charles A. Pooley, for appellant.
S. E. Filkins, for respondent.

NASH, J. The plaintiff was in the employ of the defendant as yard brakeman in the Suspension Bridge yard, and was injured in attempting to mount a crippled flat car while in motion, going at the rate of six or eight miles an hour, for the purpose of stopping the car at the proper place on what is known as the "cripple track." The accident occurred in the daytime. The plaintiff had been working for the defendant 20 years. There is in the yard a large number of tracks—47 in all—2 of which are cripple tracks upon which cars requiring repairs are placed. When trains come into the yard, inspectors, one at each side, mark the defects they discover, and take the number and defects, and cars so marked are taken out of the train, and sent to the cripple tracks. The manner of placing the cars on the cripple tracks is described by the plaintiff in his testimony. When the cars come into the yard two men come out and inspect them, and mark the defects on the cars as they go along, on the body of the car. "If there is any bad roof, or very bad brake, it is marked off with a circle, condemned for bad brake, with a circle." "During these years that I worked for the road, I was yard brakeman. I used to catch these cars as they were cut from the train, and mount them, and stop them in their place. We would go down with the engine, and pull up a string of cars, 30 or 40 or 50 or 60 cars, according to the weight of them, if they could handle them. The engineer would pull away up on the main track, and the conductor would be there, and give signals to the switch tenders what track he would want the car to go on. The switch tenders were on the ground. Stood there to throw the switch—any switch there was to be seen. They were at the head of these several tracks at the point where this long track was, where the train would connect with these several tracks I have mentioned. One man there, and one down below the other switches. There was one man stationed at the main switch —lead switch—and there was one man throws the other switches, where they branched off these several tracks. When a car was sent down, the switchman could see it, and send it off onto one of those tracks. When it got there, and got on the track, and was going along, we got up at the brake to stop it, and let it go in only so far—two of us, two men. In order to get onto these cars we had to run. They were out away loose from the train while we are down in the yard. We had to run up to meet them. They were coming towards us going west, and we had to come up and meet them." "On July 28, 1899, I took a car down on the main track, and my partner with me took two more cars down, I think it was on

the water track, or loading track; and the next car that came down was a flat car. I had to run to meet that as they came down from this main track. I ran to meet this car; came running ahead of it; crossed over ahead of it. It was coming a pretty good gait, and I had to run along side of it. I see it marked bumper bolts. I jumped on the car with my left hand in the stake hold and my left foot on the brakebeam and my right hand on the body of the car, and swung up like that (indicating). You could see it was broke. It was an old, dark splinter. I fell back, went down across the rails, and my foot catched in the split switch, and struck my back right across the rail. This end of the platform, just as I had my hand in there, I saw it bend down and splintered, and in a second I was throwed back and fell to the ground."

It appears from the description of the method of operation by which cars were sent to the cripple tracks that the mark of the inspector was not to inform the plaintiff as to how he was to perform his duty. Primarily, the inspector's mark informed the conductor that the car was to be taken out of his train, and sent to the cripple track. The conductor gave the signal to the man stationed at the main or "lead switch," and also to the switch tenders of the other tracks, "what track [cripple track] he wanted the car to go on." The switchman would see it, and send it off onto one of the cripple tracks, and as the car was moving on the cripple track it was the duty of the plaintiff and his assistant to meet it, get "up at the brake to stop it, and let it go only so far." It was not necessary that the plaintiff, for the performance of his duty, should observe the mark of the inspector upon the car. It was his duty, when he saw the car coming on one of the two cripple tracks, to run and meet it, and stop it at the proper place on the track. The cars were marked on either side—the side where the defect was found. He may or may not see the mark. Practically, he could see the mark only on the side of the car he was on. He was engaged in handling the cripple cars. The mark of the inspector, aside from indicating where the car was to go, was to inform the car repairer of the nature and extent of the defect. From the nature of the duties of the plaintiff and the manner of performance, the accident to the plaintiff was one which pertained to the risk of his employment.

The case of Arnold v. D. & H. C. Co., 125 N. Y. 15, 25 N. E. 1064, is directly in point, and the distinction between the case here and one where the master is liable because he has failed in his duty of inspection is clearly stated in the opinion. There the plaintiff was a brakeman employed in defendant's yard. There were inspectors, whose duty it was on the arrival of every train in the yard to examine each car, and, if the injury or defect was discovered, to remove the car from the train, and place it upon a track known as the "cripple track" for repairs, and in this work the plaintiff was employed. In attempting to couple two cars, one of which had a broken drawhead, in order that the latter might be placed on the cripple track, plaintiff was injured. Held, that the plaintiff took the necessary risk of the employment, one of the purposes of which was to handle and remove disabled cars. Judge Finch, in the opinion,

said there was no evidence that the defendant company failed in the performance of any duty which it owed the plaintiff. He was injured in attempting to couple two cars, one of which had a broken drawhead, and the negligence averred is the presence of that defect. But it is no ground of liability of the company that the drawhead was broken and the cars could not be coupled in the ordinary way, for the duty of the plaintiff was to handle defective as well as uninjured cars, and aid in taking the former out of the trains and placing them upon the tracks where they could be repaired. He took the necessary risk of his employment. One of the purposes of his employment was to handle and remove cars which were disabled, and, if he did not know the condition of the one in question, he was bound to assume that it might be disabled, and govern his action accordingly. "It is in that respect that this case differs essentially from Goodrich v. N. Y. C. & H. R. R. Co., 116 N. Y. 398, 22 N. E. 397, 5 L. R. A. 750, 15 Am. St. Rep. 410. In that case the cars were being coupled for the purpose of proceeding on their journey. The plaintiff was required in the nighttime, and with the aid of a lantern, to make the coupling, and found a broken drawhead, in seeking to use which his arm was crushed between the deadwoods. The case was so close upon its facts that the reversal was by a bare majority of the court; but it stands upon the distinct ground, not at all applicable to the present case, that the master had failed in his duty of inspection and repair, and the servant had a right to assume that the car was perfect, and act on that assumption. Precisely the contrary is the fact here. There had been an inspection, the coupling was for the purpose of repairs, and the servant had no right to assume that the cars were perfect, and act on that assumption. The rule and custom of the business in the yard was to chain up or prop up a defective drawhead which had fallen below its proper level, in order to make the couplings meet. That was a detail of the servant's work in the yard, and not the master's duty to the servants." The language of the court there, with proper change of phraseology, might be employed here. The mark of the inspector here was a mere detail of the work of sending the car to the cripple track, and as to that the inspectors and the servants engaged in moving the cars were co-employés. The inspection was solely for the purpose of taking the defective cars out of the trains, not for their use by the employés of the defendant. As to the manner in which the inspection should be made, the defendant owed no duty whatever to its servants engaged in the work. The judgment should be reversed.

Judgment and order reversed, and new trial ordered, with costs to the appellant to abide the event.

McLENNAN and WILLIAMS, JJ., concur. ADAMS, P. J., and SPRING, J., dissent.